**A.Y. STRAUSS, LLC**
Kelly Magnus Purcaro
101 Eisenhower Parkway, Suite 412
Roseland, New Jersey 07068
Tel.: (973) 287-5008
Fax: (973) 226-4104
kpurcaro@aystrauss.com

**HAEGGQUIST & ECK, LLP**
Amber L. Eck
*(Pro Hac Vice* to be Filed)
225 Broadway, Suite 2050
San Diego, CA 92101
Tel.: (619) 342-8000
Fax: (619) 342-7878
ambere@haelaw.com

*Counsel for Plaintiff and Proposed Class*

## UNITED STATES DISTRICT COURT
## THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVIS FITNESS STUDIO ONE LLC d/b/a CLUB PILATES MARLBORO, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br>  v.<br><br>ARCH INSURANCE COMPANY,<br><br>        Defendant. | Case No.:<br><br>       Civil Action<br><br>**CLASS ACTION COMPLAINT<br><u>& DEMAND FOR JURY TRIAL</u>** |

Plaintiff Davis Fitness Studio One LLC a/b/a Club Pilates Marlboro

("Plaintiff" or "Davis Fitness"), on behalf of itself and all others similarly situated,

bring this class action against Defendant Arch Insurance Company ("Defendant" or

"Arch"), and allege as follows based on personal knowledge as to itself and upon information and belief as to other matters based on its counsels' investigation.

## I.    NATURE OF THE ACTION

1.    Plaintiff and other businesses nationwide purchased commercial property insurance to protect their businesses if they had to temporarily shut down. They reasonably believed their policies would help protect their businesses in the unlikely event the government ordered them to stop or severely restrict operations (in connection with a pandemic or any other Covered Cause of Loss). However, after collecting billions of dollars in premiums, Defendant and other insurers are now categorically refusing to pay these legitimate claims for business interruption coverage.

2.    New Jersey and the vast majority of states across the country have entered civil authority orders requiring residents to "stay-at-home" or "shelter-in-place" and suspending or severely limiting business operations of non-essential businesses that interact with the public and/or provide social gathering places (collectively, the "COVID-19 Civil Authority Orders").

3.    These broad COVID-19 Civil Authority Orders have been financially devastating for most non-essential businesses, especially salons, restaurants, retail stores, entertainment venues, and other small, medium, and large businesses who

have been forced to close, furlough employees, and submit to a sudden shutdown of operations and cash flow that threatens their survival.

4.      Many businesses purchased insurance to protect against losses from catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, or when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. This coverage, commonly known as "business interruption coverage," is standard in most all-risk commercial property insurance policies.

5.      Despite the provision of business interruption coverage in these policies, Arch is denying its obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insureds' property arising from the COVID-19 Civil Authority Orders.

6.      Plaintiff brings this action on behalf of a Nationwide Class and a New Jersey Sub-Class (defined below in Section V) of policyholders who purchased Arch commercial property insurance policies which provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put into place by COVID-19 Civil Authority Orders.

7.    This action seeks a declaratory judgment that Arch is contractually obligated to pay business interruption losses incurred due to Plaintiff's and other Class members' compliance with COVID-19 Civil Authority Orders. In addition, Plaintiff seeks damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Arch's breach of contract and wrongful conduct.

8.    Specifically, Plaintiff, individually and on behalf of the Nationwide Class and New Jersey Sub-Class bring claims for: (1) declaratory judgment regarding business income coverage; (2) breach of contract regarding business income coverage; (3) declaratory judgment regarding civil authority coverage; (4) breach of contract regarding civil authority coverage; (5) declaratory judgment regarding extra expense coverage; and (6) breach of contract regarding extra expense coverage.

## II.    THE PARTIES

### A.    Plaintiff

9.    Plaintiff Davis Fitness Studio One LLC d/b/a Club Pilates Marlboro has a principal place of business in Marlboro Township, County of Monmouth, New Jersey. Davis Fitness has been in business since November of 2018, is owned by Brennan Davis, and its Fitness Studio is located at 12 Route 9, North Marlboro Township, NJ 07751. At all relevant times hereto, Plaintiff's Fitness Studio is and

was insured by Defendant. Plaintiff Davis Fitness was forced to close entirely on March 16, 2020 due to the applicable COVID-19 Civil Authority Orders, see, e.g. **Exhibit A** attached hereto.

**B.    Defendant**

10.    Defendant Arch Insurance Company, a member of Arch Insurance Group ("Arch Group" or "Arch"), is a Missouri corporation with a its operating center in Jersey City, New Jersey.[1]

11.    Defendant issued the Arch Policy No. SBIML0167200 to David Fitness for the policy period of May 2, 2019 through May 1, 2020.

12.    Defendant issued the Arch Policy No. SBIML0167201 to David Fitness for the policy period of May 1, 2020 through May 1, 2021.

## III.    JURISDICTION AND VENUE

13.    This Court has original jurisdiction over this action under 28 U.S.C. §1332(a) as well as the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), as to the named Plaintiff and every member of the Nationwide Class and New Jersey Sub-Class, because both of the proposed Classes contain more than 100 members, the aggregate amount in controversy exceeds $5 million, and Class members reside in New Jersey and states nationwide and are therefore diverse from Defendant.

---

[1] *See* Arch Insurance  Company website – United States Regions Overview , https://www.archcapgroup.com/Insurance/Regions/United-States  (last  accessed August 18, 2020).

14.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction for the purpose of this Complaint. This Court has personal jurisdiction over Defendant because they do a substantial amount of business in New Jersey, are authorized to conduct business in New Jersey, they operations center is based in Jersey City, New Jersey, and Defendants have intentionally availed themselves of the laws and markets of this State through the use, promotion, sale, marketing, and/or distribution of its products and services at issue in this Complaint. Defendant's liability to Plaintiff, arises from and relates to Defendant's conduct within the state of New Jersey. As set forth herein, Defendant acted within New Jersey to sell various business insurance policies within the state of New Jersey. Thus, Defendant has purposefully availed themselves of the benefits and protections of the state of New Jersey in conducting their unlawful enterprise, which purposeful availment constitutes sufficient minimum contacts with the state of New Jersey that the exercise of personal jurisdiction over Defendant with regard to the claims of Plaintiff and does not violate Due Process.

15.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also proper under 18 U.S.C. §1965(a), because Defendant transact a substantial amount of their business in this District. Alternatively, venue is proper

under 28 U.S.C. §1391(b)(3) because this Court has personal jurisdiction over Defendant.

## IV.  FACTUAL BACKGROUND

### A.  The COVID-19 Pandemic

16.    COVID-19 is an infectious disease caused by a recently discovered novel coronavirus known as SARS-CoV-2 ("Coronavirus" or "COVID-19"). The first instances of the disease spreading to humans were diagnosed in or around December 2019.

17.    On January 30, 2020, the World Health Organization ("WHO") declared that the Coronavirus outbreak constituted a public health emergency of international concern.

18.    On March 11, 2020, the WHO declared Coronavirus a worldwide pandemic.

19.    On March 13, 2020, President Trump declared the COVID-19 pandemic to be a national emergency.

20.    On March 16, 2020, the Centers for Disease Control and Prevention ("CDC") and national Coronavirus Task Force issued guidance to the American public advising individuals to adopt social distancing measures.

21.    As of August 17, 2020, the number of confirmed cases of COVID-19 is over 21 million worldwide, with over 767,000 deaths,[2] with the United States dealing with nearly 5 million confirmed cases and over 169,000 reported deaths – more than any other country in the world.[3]

### B.    Governments Across the Country Order Everyone to "Stay at Home" and Non-Essential Businesses to Close

22.    On March 9, 2020, New Jersey Governor Philip Murphy declared a state of emergency.

23.    On March 16, 2020, Murphy issued Executive Order No. 104, prohibiting any gathering of 50 or more people and discouraging all non-essential gatherings of any size. Gyms, fitness centers, and classes "are ordered closed to members of the public, effective 8:00 p.m. on Monday, March 16, 2020. These facilities are to remain closed to the public for as long as this Order remains in effect".

24.    On March 21, 2020, Governor Murphy issued Executive Order No. 107, requiring "All New Jersey residents shall remain home or at their place of

---

[2]    *See Coronavirus disease (COVID-19) Situation Report – 183*, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited August 17, 2020).

[3]    *See Cases in the U.S.*, Center for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited August 17, 2020).

residence" unless they are obtaining essential services and when in public my practice strict social distancing.

25.     All New Jersey businesses not deemed essential, including Davis Fitness, were ordered to close their doors.

26.     Other states around the Country have implemented similar orders, requiring large scale business closures and imposing other limitations on businesses that prevent them from operating or limit their operations.

27.     For example, on March 16, 2020, New York Governor Andrew Cuomo and Connecticut Governor Ned Lamont ordered the closure of all gyms, movie theaters, bars, and casinos. They also ordered all restaurants to close except for take-out and delivery orders.

28.     Altogether, 49 state governments have enacted at least one civil authority order prohibiting or severely limiting restaurants and other non-essential businesses. In addition to New Jersey, all but six states have enacted COVID-19 Civil Authority Orders, including "stay-at-home" or "shelter-in-place" orders; 35 states have closed all non-essential businesses, and other states are taking measures to limit business operations.  All 50 states have closed schools, and all but one state (South Dakota) has closed restaurants and bars for services other than take-out and delivery.

**C.    The Losses from These Business Closures Are Covered Business Interruptions Under Arch's Insurance Policies**

29.    The insurance policies Arch issued to Plaintiff are standard policies which provide coverage for "direct physical loss or damage to your personal business or property." Plaintiff's Arch policies in issue are standard Commercial Inland Marine policies with endorsements (entitled "Xponential Fitness Endorsement") for which Plaintiff paid an additional premium, that cover loss or damage to the covered premises, including loss of business income, resulting from all risks other than those expressly excluded.

30.    Plaintiff's Arch Policies and endorsements, as well as the policies and endorsements of other Class members, are standard forms used by Arch for all insureds with applicable coverage.

31.    One of the coverages provided by Plaintiff's Arch Policies is business interruption coverage ("Business Income and Extra Expenses"), which generally indemnifies Plaintiff for lost income and profits if its business are shut down.

32.    Plaintiff's Inland Marine Policy Xponential Fitness Endorsement Coverage Forms, Form 00 ML0207 00 11 03, provides coverage as follows:

> **13.Business Income and Extra Expense**
>
> a.    Coverage is extended to cover "Business Income"/"Extra Expense" incurred when your covered property is damaged by a Covered Cause of Loss. We will pay any "Extra Expense" to continue your normal operations:
>
> (1) at the described premises; or

(2) at replacement premises or temporary locations; including:

(a) relocation expenses; and

(b) costs to equip or operate the replacement or temporary locations; and

We will also pay for any corresponding "Extra Expense" to minimize the suspension of your normal operations if you cannot continue them.

b.  We will pay for the actual loss of "Business Income" you sustain and necessary "Extra Expense" caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. The coverage for "Business Income" will begin 72 hours after the time of that action and will apply for a period of up to three consecutive weeks after coverage begins. The coverage for "Extra Expense" will begin immediately after the time of that action and will end: (1) 3 consecutive weeks after the time of that action; or (2) When your "Business Income" coverage ends; whichever comes first.

c. The following, when used in this section, are defined as follows:

(1) "Business Income" means Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred during the "period of restoration;" and continuing normal operating expenses including payroll.

(2) "Extra Expense" means necessary expenses you incur during the "Period of Restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

(3) "Period of Restoration" means the period of time that:

(a) Begins with the date of physical loss or damage caused by or resulting from any Covered Cause of Loss; and

(b) Ends on the date when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality.

11

(c) "Period of Restoration" does not include any increased period required due to the enforcement of any ordinance or law that regulates the construction, use or repair, or requires the tearing down of any property; or requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

(d) The expiration date of this policy will not cut short the "Period of Restoration."

d. The most we will pay under this section is $100,000 for any one occurrence. No coinsurance shall apply to this coverage. This limit applies in addition to the applicable Limit of Insurance shown in the Declarations.

33.     Defendant's Form policy coverage detailed above provides Plaintiff coverage for direct physical loss of or physical damage to Covered Properties at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

34.     The interruption of Plaintiff's and other Class members' businesses was not caused by any of the exclusions set forth in the applicable policies.

35.     Plaintiff's and all Class members have suffered a direct physical loss of, and damage to, their properties because they have been unable to use their properties for their intended purposes.

36.     Notwithstanding the foregoing, Arch denied Plaintiff Davis Fitness' claims for business interruption losses.

**D.    Arch's Denial of Plaintiff's and Other Policyholders' Insurance Claims**

37.    On or about April 17, 2020, Plaintiff Davis Fitness requested insurance coverage from Arch for the loss of use of his covered property including loss of business income and extra expenses caused by the direct loss of use of his property under the applicable COVID-19 Civil Authority Orders.

38.    Plaintiff's covered property is a fitness studio, i.e. a gym.  It cannot be disputed that Plaintiff has lost the ability to operate his business, i.e. loss of use of his property in New Jersey through no fault of his own.

39.    By way of example, see Law360 article dated August 5, 2020 attached hereto as **Exhibit B**, detailing the $10,000 daily fine and arrest of another New Jersey gym owner who attempted to use and operate his facility in defiance of the COVID-19 Civil Authority Orders in New Jersey.

40.    Arch notified Davis Fitness by letter dated May 13, 2020, that they were requesting additional information related to Davis Fitness' claim for business interruption losses.

41.    Notably, Plaintiff and other Class Members received guidance from Arch's broker, Epic Entertainment and Sports Group (herein "Broker"), in responding to widespread denial of coverage by Arch, and noted therein:

> The current insurance industry position is that the COVID-19 virus does not meet the definition of causing direct physical loss or damage to covered property. This detail is

the main point of contention as to whether Business Interruption coverage will apply to claims related to COVID-19 closures or interruptions to business. Coverage may only apply if the program carrier is forced to adjust their interpretation of what constitutes "physical damage or loss" through judicial or legislative action.

42.    On or about June 29, 2020, Plaintiff David Fitness responded to Arch's request for more information regarding business interruption losses.

43.    Arch notified Davis Fitness by letter dated July 23, 2020, consistent with the Broker's guidance, that it was denying Davis Fitness' Claim for business interruption losses. Arch advised Plaintiff of its internal appeal process.

44.    On July 30, 2020, pursuant to Arch's internal appeal process, Davis Fitness appealed Arch's denial decision.

45.    Pursuant to Arch's internal appeals process and N.J.A.C. 11-25:2.3, Arch is required to make a decision on the appeal and communicate its decision to Plaintiff no later than 13 business from receipt of Plaintiff's appeal, i.e. August 18, 2020.

46.    Arch has failed to respond to Plaintiff's appeal and has therefore confirmed its denial of Plaintiff's claims.

47.    Arch denied Plaintiff's claims without any inspection or review of either of Plaintiff's physical locations or documents concerning their business activities in 2020.

48.     Arch has thereby waived any right to inspect these premises, deny coverage for any reason related to conditions at these locations, or raise any defense related to conditions at these locations or facts specific to Plaintiff.

49.     The speed with which Arch denied Plaintiff's claims indicates that Arch could not have engaged in a good faith or reasonable investigation of the claims which included assessment of facts or issues relevant to Plaintiff.

50.     Arch accepted the premiums paid by Plaintiff with no intention of providing lost business income, physical damage, civil authority, or other applicable coverage for claims like these submitted by Plaintiff and the proposed Class members, and which were denied by Arch.

51.     Arch's rejection of Plaintiff's claims was part of Arch's policy to limit its losses during this pandemic, despite the fact that the policies provide coverage for losses due to loss of use of property and from closure orders issued by civil authorities (among other coverage).

52.     Although industry trade groups have argued that insurance companies do not have the funds to pay claims related to the Coronavirus and will require government assistance, the reality is that insurers are simply trying to minimize their

exposure. Collectively, the U.S. property-casualty insurance industry has about $800 billion in surplus, the industry term for assets minus liabilities.[4]

53.    Despite the billions of dollars Arch has collected in insurance premiums, including the additional premiums paid by Plaintiff and Class members for loss of use of their covered properties, it is categorically denying claims brought by businesses ordered to close and therefore have lost the use of their business properties following the Coronavirus.

54.    Arch's wrongful denials of Plaintiff's claims were not isolated incidents. Rather, on information and belief, Arch has engaged in the same misconduct with claims submitted by numerous Arch's insureds who have suffered losses related to the Coronavirus pandemic and submitted claims which were categorically denied (see, e.g. advice from Broker cited above).

55.    Plaintiff's claims and those of the proposed Class all arise from a single course of conduct by Arch: its systematic and blanket refusal to provide any coverage for business losses related to the COVID-19 pandemic and the related actions taken by civil authorities to suspend business operations.

---

[4]    Leslie Scism and Brody Mullins, *The Legal Fight Between Insurers and Businesses is Expanding*, *The Wall Street Journal*, (April 29, 2020), available at https://www.wsj.com/articles/the-legal-fight-between-insurers-and-businesses-is-expanding-11588166775?mod=searchresults&page=1&pos=3 (last visited July 21, 2020).

56.     Arch's wrongful conduct has caused significant damage, and if left unchecked will continue to cause significant damage, to Plaintiff and the other members of the proposed Class.

57.     Arch's categorical treatment, failure to investigate in good faith, and denial of Plaintiff's and the Class members' claims appears to be part of a broader strategy being employed by the insurance industry generally, to broadly deny claims for business interruption coverage related to the Coronavirus pandemic, as has been widely reported by the media and resulted in numerous lawsuits brought by businesses against property insurance companies throughout the country.

58.     Many small businesses that maintain commercial policies with business interruption coverage will have significant uninsured losses absent declaratory relief from this Court. Indeed, even if state and local governments re-open, small businesses will almost certainly still be under social-distancing mandates, and salons such as Davis Fitness, will continue to experience diminishing revenues.

59.     Arch's denial of Plaintiff's claim affirms the guidance of the Broker, i.e. that Arch will deny Business Interruption coverage claims related to COVID-19 closures or interruptions to business only if Arch is forced to adjust their interpretation of what constitutes "physical damage or loss" through judicial or legislative action.

60.     A declaratory judgment is necessary to determine that the business income loss and extra expense coverage provided in standard Arch commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from Civil Authority Orders, and to prevent Plaintiff and similarly situated Class members from being denied critical coverage for which they have paid premiums

## V.    CLASS ACTION ALLEGATIONS

61.     Pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 23(a),(b)(2), and (b)(3) Plaintiff brings claims on behalf of themselves and on behalf of all other persons similarly situated, and seek to represent the following "Nationwide Class" and "New Jersey Sub-Class":

62.     The Nationwide Class is defined as:  All persons and entities who have entered into a standard commercial property insurance policies and endorsements with an Arch insurance carrier to insure property in the United States, where such policy provides for business income loss and extra expense coverage and does not exclude coverage for pandemics, and who have suffered losses due to measures put in place by a COVID-19 Civil Authority Order.

63.     The New Jersey Sub-Class is defined as:  All persons and entities who have entered into a standard commercial property insurance policies and endorsements with an Arch insurance carrier to insure property in New Jersey, where

such policy provides for business income loss and extra expense coverage and does not exclude coverage for pandemics, and who have suffered losses due to measures put in place by a COVID-19 Civil Authority Order.

64.    Excluded from each of the Classes are the Defendant, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**A.    Numerosity: Rule 23(a)(1)**

65.    Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed Classes after discovery and before the Court determines whether class certification is appropriate.

66.    Class certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**B.    Typicality: Rule 23(a)(3)**

67.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same standard policy provisions entered into with Arch. Each Class members'

insurance policy contains the same form providing coverage for business income loss. None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic. As a result, a declaratory judgment as to the rights and obligations under Plaintiff's policies will address the rights and obligations of all Class members.

### C.    Adequacy: Rule 23(a)(4)

68.    Plaintiff will fairly and adequately represent and protect the interests of the Class and New Jersey Sub-Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, including insurance coverage and other consumer protection litigation. Plaintiff intends to prosecute this action vigorously. Neither Plaintiff nor their counsel have interests that conflict with the interests of the other Class members.

### D.    Commonality and Predominance: Rule 23(a)(2)

69.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact that are common to each of the Classes. These common questions predominate over any questions affecting only individual Class members. The questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether there is an actual controversy between Plaintiff and Arch as to the rights, duties, responsibilities, and obligations of the parties under the

business interruption coverage provisions in standard commercial property insurance policies;

(b)    Whether measures to reduce the spread of the COVID-19 pandemic are excluded from Plaintiff's and Class members' standard commercial property insurance policies;

(c)    Whether the measures put in place by civil authorities to stop the spread of COVID-19 caused physical loss or damage to the covered commercial properties;

(d)    Whether the COVID-19 virus meets the definition of causing direct physical loss or damage to covered property;

(e)    Whether Business Interruption coverage will apply to claims related to COVID-19 closures or interruptions to business;

(f)    Whether Arch has breached the insurance policies with business interruption coverage by denying or intending to deny claims for coverage;

(g)    Whether Arch's violations of the standard commercial property insurance policies were committed intentionally, recklessly, or negligently and;

(h)    Whether Plaintiff and Class members suffered damages as a result of Arch's breach.

### E.    Superiority of Class Action: Rule 23(b)(3)

70.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members. The joinder of individual Class members is impracticable because of the large number of Class members who purchased commercial property insurance policies from Arch.

71.    Because a declaratory judgment as to the rights and obligations under the uniform insurance policies will apply to all Class members, most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Arch, by even a small fraction of the Class members, would be enormous.

72.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, conserves the resources of both the judiciary and the parties, and protects the rights of each Class member more effectively. The benefits to the parties, the Court, and the public from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individual litigation. Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D). Class treatment will also

avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

73.     Fed. R. Civ. P. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any class into Sub-Classes.

74.     There are no individualized factual or legal issues for the court to resolve that would prevent this case from proceeding as a class action. Class action treatment will allow those who are similarly situated to litigate their claims in the manner that is most efficient and economical for the parties and the court. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**F.     Rule 23(b)(2) Certification**

75.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2). The prosecution of separate actions by individual Class members would create a risk of

inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendant.

76.    In addition, the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

77.    Defendant has also acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## VI.    CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE
### (On Behalf of the Nationwide Class and New Jersey Sub-Class)

78.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if fully set forth herein.

79.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and New Jersey Sub-Class.

80.    Plaintiff's Arch Policies and endorsements, as well as those of the other Class members, are contracts under which Arch was paid premiums in exchange for

its contractual agreement to pay Plaintiff's, and the other Class members', losses for claims covered by the policies.

81.    As part of standard business interruption coverage, Arch agreed to pay for insureds' Loss of Use, Loss of Business Income and Extra Expenses sustained due to the necessary suspension of their operations during the "period of restoration." Arch also agreed to pay its insureds' actual loss of Business Income and Extra Expenses sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage. "Business Income" under the policies means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred," as well as "[c]ontinuing normal operating expenses incurred, including payroll."

82.    The COVID-19 Civil Authority Orders caused direct physical loss of use and damage to Plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Accordingly, losses caused by the COVID-19 Civil Authority Orders triggered the Loss of Use, Loss of Business Income and Extra Expenses provision of Plaintiff's and the other Class members' Arch policies.

83.    Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Arch and Arch is estopped from asserting them. Yet Arch has abrogated its insurance coverage

obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide the coverage to which Plaintiff and Class members are entitled.

84. Arch has denied Plaintiff's and other Class members' claims for loss of use and business interruption losses caused by COVID-19 Civil Authority Orders on a uniform and class-wide basis without individual bases or investigations, so the Court can render declaratory judgment regardless of whether a particular Class member has filed a claim.

85. An actual case or controversy exists regarding Plaintiff's and the other Class members' rights and Arch's obligations under the policies to pay for losses incurred by Plaintiff and the other Class members in connection with the business interruption caused by COVID-19 Civil Authority Orders.

86. Pursuant to 28 U.S.C. §2201, Plaintiff and other Class members seek a declaratory judgment from this Court as follows:

(a) Plaintiff and the other Class members' Loss of Use, Business Income losses, and Extra Expenses incurred due to COVID-19 Civil Authority Orders are insured losses under their Arch policies; and

(b) Arch is obligated to pay Plaintiff and other Class members for the full amount of their Loss of Use, Business Income losses and Extra Expenses (up to the maximum allowable amount under the policies) incurred in connection with

the COVID-19 Civil Authority Orders during the period of restoration and the necessary interruption of their businesses stemming therefrom.

## COUNT II
## BREACH OF CONTRACT – BUSINESS INCOME COVERAGE

87.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if fully set forth herein.

88.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and New Jersey Sub-Class.

89.    Plaintiff's Arch Policies including endorsements, as well as those of other Class members, are contracts under which Arch was paid premiums in exchange for its promise to pay Plaintiff's, and the other Class members', losses for claims covered by the policies.

90.    As part of standard business interruption coverage, Arch agreed to pay for insureds' actual loss of Use, loss of Business Income and Extra Expenses sustained due to the necessary suspension of their operations during the "period of restoration." Arch also agreed to pay its insureds' actual losses, including loss of Business Income, sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage. "Business Income" under the policies means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred," as well as "[c]ontinuing normal operating expenses incurred, including payroll."

91.     The COVID-19 Civil Authority Orders caused direct physical loss and damage to Plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Accordingly, losses caused by the COVID-19 Civil Authority Orders triggered the Business Income provision of Plaintiff's and the other Class members' Arch policies.

92.     Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Arch and/or Arch is estopped from asserting them. Yet Arch has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms. By denying coverage for any Business Income loss incurred by Plaintiff's or other Class members as a result of the COVID-19 Civil Authority Orders, Arch has breached its coverage obligations under the policies.

93.     As a result of Arch's breaches of contract, Plaintiff and other Class members have sustained substantial damages for which Arch is liable in an amount to be established at trial.

## COUNT III
## DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE

94.     Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if fully set forth herein.

95.     Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and New Jersey Sub-Class.

96.    Plaintiff's Arch Policies including endorsements, as well as those of other Class members, are contracts under which Arch was paid premiums in exchange for its promise to pay Plaintiff's, and other Class members', losses for claims covered by the policies.

97.    Plaintiff's Arch Policies including endorsements provide for "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." Accordingly, the COVID-19 Civil Authority Orders triggered the Civil Authority provision under Plaintiff's and the other Class members' Arch policies.

98.    Plaintiff and Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Arch and/or Arch is estopped from asserting them. Yet Arch has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

99.    Arch has denied claims related to COVID-19 on a uniform and class-wide basis without individual bases or investigations, so the Court can render

declaratory judgment regardless of whether a particular Class member has filed a claim.

100.   An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Arch's obligations under the policies to reimburse Plaintiff and other Class members for the full amount of covered Civil Authority losses incurred by Plaintiff and other Class members in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

101.   Pursuant to 28 U.S.C. §2201, Plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

(a)  Plaintiff's and other Class members' Civil Authority losses incurred in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom are insured losses under their policies; and

(b)  Arch is obligated to pay Plaintiff and other Class members for the full amount of their Civil Authority losses (up to the maximum allowable amount under the policies) incurred in connection with the COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

**COUNT IV**
**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**

102.   Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if fully set forth herein.

103.   Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and New Jersey Sub-Class.

104.   Plaintiff's Arch Policies including endorsements, as well as those of other Class members, are contracts under which Arch was paid premiums in exchange for its promise to pay Plaintiff's, and the other Class Members', losses for claims covered by the policies.

105.   Plaintiff's Arch Policies including endorsements provide for "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." Accordingly, the COVID-19 Civil Authority Orders triggered the Civil Authority provision under Plaintiff's and the other Class members' Arch policies.

106.   Plaintiff and the other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Arch and/or Arch is estopped from asserting them. Yet Arch has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms. By denying coverage for any business losses incurred by Plaintiff and other Class members in connection

31

with the COVID-19 Civil Authority Orders, Arch has breached its coverage obligations under the policies.

107.   As a result of Arch's breaches of contract, Plaintiff and other Class members have sustained substantial damages for which Arch is liable in an amount to be established at trial.

## COUNT V
## DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE

108.   Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if fully set forth herein.

109.   Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and the New Jersey Sub-Class.

110.   Plaintiff's Arch Policies and endorsements, as well as those of other Class Members, are contracts under which Arch was paid premiums in exchange for its promise to pay Plaintiff's, and other Class members', losses for claims covered by the policies.

111.   Plaintiff's Arch Policies and endorsements provide that Arch would pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises. "Extra Expense" means expenses "[t]o avoid or minimize the suspension of business and to continue 'operations,'" and to repair or

replace property. Due to the COVID-19 Civil Authority Orders, Plaintiff and other Class members incurred Extra Expense at their Covered Properties.

112.   Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Arch and/or Arch is estopped from asserting them. Yet Arch has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class members are entitled.

113.   Arch has denied claims related to COVID-19 on a uniform and class-wide basis without individual bases or investigations, so the Court can render declaratory judgment regardless of whether a particular Class member has filed a claim.

114.   An actual case or controversy exists regarding Plaintiff's and other Class members' rights and Arch's obligations under the policies to reimburse Plaintiff and the other Class members for the full amount of Extra Expense losses incurred by Plaintiff and Class members in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

115.   Pursuant to 28 U.S.C. §2201, Plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

(a)    Plaintiff's and other Class members' Extra Expense losses incurred in connection with the COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom are insured losses under their policies; and

(b)    Arch is obligated to pay Plaintiff and other Class members for the full amount of their Extra Expenses losses (up to the maximum allowable amount under the policies) in connection with the COVID- 19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

**COUNT VI**
**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**

116.   Plaintiff hereby reallege and incorporate by reference the allegations contained in the paragraphs above, as if fully set forth herein.

117.   Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and New Jersey Sub-Class.

118.   Plaintiff's Arch Policies and endorsements, as well as those of the other Class members, are contracts under which Arch was paid premiums in exchange for its promise to pay Plaintiff's, and the other Class members', losses for claims covered by the policy.

119.   Plaintiff's Arch Policies and endorsements provide that Arch agreed to pay necessary Extra Expense that it incurred during the "period of restoration" that would not have incurred if there had been no direct physical loss or damage to the

described premises. "Extra Expense" means expenses "[t]o avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property. Due to the COVID-19 Civil Authority Orders, Plaintiff and other Class members incurred Extra Expense at their Covered Properties.

120.  Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Arch and/or Arch is estopped from asserting them. Yet Arch has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms.

121.  By denying coverage for any business losses incurred by Plaintiff and other Class members in connection with the COVID-19 Civil Authority Orders, Arch has breached its coverage obligations under the policies.

122.  As a result of Arch's breaches of the policies, Plaintiff and the other Class members have sustained substantial damages for which Arch is liable in an amount to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all similarly situated individuals and entities, pray for relief and judgment against Defendant as follows:

A.    Determining that this action is a proper class action under one or more provisions of Federal Rule of Civil Procedure 23, appointing Plaintiff to serve as a Class Representatives, and appointing its counsel to serve as Class Counsel;

B.    Issuing a Declaratory Judgment declaring the parties' rights and obligations under the insurance policy provisions at issue;

C.    Awarding Plaintiff and the Classes compensatory damages against Defendant, jointly and severally, for all damages sustained as a result of Defendant's breach of the policies in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiff and the Classes pre-judgment and post-judgment interest as well as reasonable attorneys' fees and expenses incurred in this action; and

E.    Awarding such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated:  August 19, 2020                  Respectfully submitted,

*/s/ Kelly M. Purcaro*

Kelly M. Purcaro
**A.Y. STRAUSS LLC**
101 Eisenhower Parkway, Suite 412
Roseland, New Jersey 07068
Tel.: (973) 287-5008
Fax: (973) 226-4104
kpurcaro@aystrauss.com

Amber L. Eck
*(Pro Hac Vice* to be Filed)
**HAEGGQUIST & ECK, LLP**
225 Broadway, Suite 2050
San Diego, CA 92101
Tel.: (619) 342-8000
Fax: (619) 342-7878
ambere@haelaw.com

*Counsel for Plaintiff and proposed Class*

## CERTIFICATE OF NON-ARBITRABILITY
## PURSUANT TO L. CIV. R. 201.1(d)(3)

I certify, pursuant to L. Civ. R. 201.1(d)(3), that the above-captioned matter is not arbitrable because the amount in controversy exceeds the sum of $150,000 exclusive of interest and costs and any claim for punitive damages.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of August, 2020.

_s/Kelly M. Purcaro_

Kelly M. Purcaro

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify that to the best of my knowledge, the matter in controversy is not the subject of any other action except, *7th Inning Stretch LLC d/b/a Everett AquaSox; DeWine Seeds Silver Dollars Baseball, LLC; Whitecaps Professional Baseball Corporation*, 2:20-cv-08161-SDW-LDW, or of any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct.

Executed 19th day of August, 2020.

*s/Kelly M. Purcaro*

Kelly M. Purcaro

# EXHIBIT A

## EXECUTIVE ORDER NO. 104

WHEREAS, through Executive Order No. 102, which I signed on February 3, 2020, I created the State's Coronavirus Task Force, chaired by the Commissioner of the New Jersey Department of Health ("DOH"), in order to coordinate the State's efforts to appropriately prepare for and respond to the public health hazard posed by Coronavirus disease 2019 ("COVID-19"); and

WHEREAS, in light of the dangers posed by COVID-19, I issued Executive Order No. 103 (2020) on March 9, 2020, the facts and circumstances of which are adopted by reference herein, which declared both a Public Health Emergency and State of Emergency; and

WHEREAS, in accordance with N.J.S.A. App. A:9-34 and -51, I reserved the right to utilize and employ all available resources of State government to protect against the emergency created by COVID-19; and

WHEREAS, in accordance with N.J.S.A App. A:9-40, I declared that, due to the State of Emergency, no municipality, county, or any agency or political subdivision of this State shall enact or enforce any order, rule, regulation, ordinance, or resolution which will or might in any way conflict with any of the provisions of my Executive Orders, or which will in any way interfere with or impede their achievement; and

WHEREAS, on March 11, 2020, COVID-19 was declared to be a global pandemic by the World Health Organization; and

WHEREAS, on March 13, 2020, the President of the United States declared a national emergency pursuant to his constitutional and statutory powers, including those granted by Sections 201 and 301 of the National Emergencies Act (50 U.S.C. § 1601, *et seq.*) and consistent with Section 1135 of the Social Security Act, as amended (42 U.S.C. § 1320b-5); and

2

WHEREAS, the President of the United States also determined on March 13, 2020, that the COVID-19 pandemic was of sufficient severity and magnitude to warrant an emergency determination under Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5121-5207; and

WHEREAS, as of March 16, 2020, according to the Centers for Disease Control and Prevention ("CDC"), there were more than 130,000 confirmed cases of COVID-19 worldwide, with over 6,500 of those cases having resulted in death; and

WHEREAS, as of March 16, 2020, there were more than 4,900 confirmed cases of COVID-19 in the United States, with 67 of those cases having resulted in death; and

WHEREAS, as of March 16, 2020, there were 178 positive cases of COVID-19 in New Jersey, spread across numerous counties; and

WHEREAS, social mitigation strategies for combatting COVID-19 requires every effort to reduce the rate of community spread of the disease; and

WHEREAS, as of March 15, 2020, the CDC recommends that for the next eight weeks, gatherings of 50 or more people be canceled or postponed throughout the United States; and

WHEREAS, public and private preschool programs, elementary and secondary schools, and institutions of higher education are locations where significant numbers of students, educators, and support staff gather, often in close proximity in classrooms, hallways, cafeterias, and gymnasiums; and

WHEREAS, suspending in-person preschool programs, K-12 education, and in-person instruction at institutions of higher education are part of the State's mitigation strategy to combat COVID-19 and reduce the rate of community spread; and

3

WHEREAS, my Administration is committed to ensuring that all students will continue to have access to a quality education, in addition to school meals that are provided or subsidized for students from low-income families; and

WHEREAS, casinos, racetracks, gyms, fitness centers, movie theaters, performing arts centers, other concert venues, nightclubs, and other entertainment centers, which are vital to the economic health of the State, are also locations where large numbers of individuals gather in close proximity; and

WHEREAS, many individuals also come into contact with common surfaces at gyms, fitness centers, and other entertainment centers; and

WHEREAS, suspending operations at these businesses is part of the State's mitigation strategy to combat COVID-19 and reduce the rate of community spread; and

WHEREAS, even on casino floors, where slot machines or other casino games may be several feet apart, many individuals come into contact with common surfaces; and

WHEREAS, in contrast to gaming at brick-and-mortar facilities, online gaming provides a safe mode of entertainment during a time when physical proximity to other individuals can be dangerous; and

WHEREAS, the CDC has advised that COVID-19 spreads most frequently through person-to-person contact when individuals are within six feet or less of one another; and

WHEREAS, as a result, the CDC has recommended that individuals practice "social distancing" to prevent community spread of the virus; and

WHEREAS, the CDC has defined social distancing as the practice of "remaining out of congregate settings, avoiding mass gatherings, and maintaining distance (approximately 6 feet or 2 meters) from others when possible"; and

4

WHEREAS, bars and restaurants are locations where significant numbers of individuals gather in close proximity, making adherence to social distancing protocols impossible or impracticable; and

WHEREAS, to mitigate community spread of COVID-19, it is necessary to limit the unnecessary movement of individuals in and around their communities and person-to-person interactions in accordance with CDC and DOH guidance; and

WHEREAS, on March 15, 2020, the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, called for "a dramatic diminution of the personal interaction that we see in restaurants and in bars," and recommended pursuing "[w]hatever it takes to do that"; and

WHEREAS, the provision of take-out and delivery services do not pose the same danger of widespread person-to-person contact while still preserving necessary food delivery services for New Jersey residents; and

WHEREAS, narrowing scope of service or hours of operation for restaurants and certain retail establishments permits individuals to access food, clothing, and other essential materials while also limiting unnecessary person-to-person contact; and

WHEREAS, it is critical to ensure that law enforcement resources, particularly those that might otherwise be required to respond to late-night incidents, not be unnecessarily diverted from responding to COVID-19 related issues and maintaining public safety; and

WHEREAS, the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A: 9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto, confer upon the Governor of the State of New Jersey certain emergency powers, which I have invoked;

5

NOW, THEREFORE, I, PHILIP D. MURPHY, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and by the Statutes of this State, do hereby ORDER and DIRECT:

1.    All gatherings of persons in the State of New Jersey shall be limited to 50 persons or fewer, excluding normal operations at airports, bus and train stations, medical facilities, office environments, factories, assemblages for the purpose of industrial or manufacturing work, construction sites, mass transit, or the purchase of groceries or consumer goods.

2.    All public, private, and parochial preschool program premises, and elementary and secondary schools, including charter and renaissance schools, shall be closed to students beginning on Wednesday, March 18, 2020, and shall remain closed as long as this Order remains in effect.

3.    All institutions of higher education shall cease in-person instruction beginning on Wednesday, March 18, 2020, and shall cease such in-person instruction as long as this Order remains in effect. The Secretary of the Office of Higher Education shall have the authority to grant a waiver to allow in-person instruction to students on a case-by-case basis where a compelling rationale to allow such access exists. The Secretary of the Office of Higher Education shall coordinate with institutions of higher education to determine appropriate student housing conditions for those students who reside in on-campus housing as their primary residence.

4.    The Commissioner of the Department of Education ("DOE"), in consultation with the Commissioner of DOH, shall be authorized to permit schools to remain open on a limited basis for the provision of food or other essential, non-educational services, or for educational or child care services if needed in emergency situations after consultation with the Commissioner of DOH. The Commissioner of DOE shall also have the authority to close any other career or

6

training facilities over which he has oversight, after consultation with the Commissioner of DOH.

5.    The Commissioner of DOE shall continue working with each public school district, and private and parochial schools as appropriate, to ensure that students are able to continue their educations during this time period through appropriate home instruction.    Local school districts, charter schools, and renaissance schools, in consultation with the Commissioner of DOE, shall have the authority and discretion to determine home instruction arrangements as appropriate on a case-by-case basis to ensure all students are provided with appropriate home instruction, taking into account all relevant constitutional and statutory obligations.

6.    The Secretary of the Department of Agriculture, in conjunction with the Commissioner of DOE, shall take all necessary actions to ensure that all students eligible for free or reduced meals shall continue to receive the services or supports necessary to meet nutritional needs during closures.

7.    The following facilities are ordered closed to members of the public, effective 8:00 p.m. on Monday, March 16, 2020.    These facilities are to remain closed to the public for as long as this Order remains in effect.    The State Director of Emergency Management, who is the Superintendent of State Police, shall have the discretion to make additions, amendments, clarifications, exceptions, and exclusions to this list:

      a.    Casino gaming floors, including retail sports wagering lounges, and casino concert and entertainment venues.    Online and mobile sports and casino gaming services may continue to be offered notwithstanding the closure of the physical facility.

      b.    Racetracks, including stabling facilities and retail sports wagering lounges.    Mobile sports wagering

7

services may continue to be offered notwithstanding the closure of the physical facility.

c.   Gyms and fitness centers and classes.

d.   Entertainment centers, including but not limited to, movie theaters, performing arts centers, other concert venues, and nightclubs.

8.   Other non-essential retail, recreational, and entertainment businesses must cease daily operations from 8:00 p.m. until 5:00 a.m.. From 5:00 a.m. until 8:00 p.m., these businesses may remain open if they limit their occupancy to no more than 50 persons and adhere to social distancing guidelines. Examples of essential businesses excluded from this directive include: grocery/food stores, pharmacies, medical supply stores, gas stations, healthcare facilities and ancillary stores within healthcare facilities. The State Director of Emergency Management, who is the Superintendent of State Police, shall have the discretion to make additions, amendments, clarifications, exceptions, and exclusions to the list of essential businesses and to the timelines applicable to operating hours.

9.   All restaurants, dining establishments, and food courts, with or without a liquor license, all bars, and all other holders of a liquor license with retail consumption privileges, are permitted to operate their normal business hours, but are limited to offering only food delivery and/or take-out services. If alcoholic beverages are to be sold from a restaurant, dining establishment or bar with a liquor license, such sales shall be limited to original containers sold from the principal public barroom. All retail sales of alcoholic beverages by limited brewery licensees, restricted brewery licensees, plenary and farm winery licensees (and associated salesrooms), craft distillery licensees and cidery and meadery licensees must be in original containers and must be delivered by licensed entities and/or by customer pick up.

8

10.  In accordance with N.J.S.A. App. A:9-33, et seq., as
supplemented and amended, the State Director of Emergency
Management, who is the  Superintendent of State Police, through
the police agencies under his control, to determine and control the
direction of the flow of vehicular traffic on any State or
interstate highway, municipal or county road, and any access road,
including the right to detour, reroute, or divert any or all traffic
and to prevent ingress or egress from any area that, in the State
Director's discretion, is deemed necessary for the protection of
the health, safety, and welfare of the public, and to remove parked
or abandoned vehicles from such roadways as conditions warrant.

11.  The Attorney General, pursuant to the provisions of
N.J.S.A. 39:4-213, shall act through the Superintendent of State
Police, to determine and control the direction of the flow of
vehicular traffic on any State or interstate highway, municipal or
county road, and any access road, including the right to detour,
reroute, or divert any or all traffic, to prevent ingress or egress,
and to determine the type of vehicle or vehicles to be operated on
such roadways. I further authorize all law enforcement officers to
enforce any such order of the Attorney General or Superintendent of
State Police within their respective municipalities.

12.  No municipality, county, or any other agency or political
subdivision of this State shall enact or enforce any order, rule,
regulation, ordinance, or resolution which will or might in any way
conflict with any of the provisions of this Executive Order, or which
will in any way interfere with or impede its achievement.

13.  It shall be the duty of every person or entity in this
State or doing business in this State and of the members of the
governing body and every official, employee, or agent of every
political subdivision in this State and of each member of all other
governmental bodies, agencies, and authorities in this State of any

9

nature whatsoever, to cooperate fully in all matters concerning this Executive Order.

14.  Penalties for violations of this Executive Order may be imposed under, among other statutes, N.J.S.A. App. A:9-49 and -50.

15.  This Order shall take effect immediately and shall remain in effect until revoked or modified by the Governor, who shall consult with the Commissioner of DOH as appropriate.

GIVEN, under my hand and seal this 16th day of March, Two Thousand and Twenty, and of the Independence of the United States, the Two Hundred and Forty-Fourth.

[seal]                    /s/ Philip D. Murphy

Governor

Attest:

/s/ Matthew J. Platkin

Chief Counsel to the Governor

# EXHIBIT B



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# NJ Wants $10K Daily Fine Over Gym's 'Brazen' Virus Defiance

By **Jeannie O'Sullivan**

Law360 (August 4, 2020, 3:56 PM EDT) -- The state of New Jersey wants a Bellmawr gym to pay at least $10,000 for each day it remains open in "brazen" defiance of COVID-19 shutdown orders, marking the latest showdown in the biggest legal battle over the Garden State's closure mandates.

In a letter to Superior Court Judge Robert T. Lougy, Deputy Attorney General Stephen Slocum said Monday that Atilis Gym's two owners kicked down a barricade on the gym's premises Saturday and let in patrons as a crowd of supporters and news reporters stood by. The move came days after the owners were arrested and held in contempt for violating a previous order to limit operations.

The ongoing flouting of the pandemic orders puts the public's health and safety in danger, making it clear sanctions and relief are warranted, Slocum wrote.

"Defendant Atilis Gym's brazen conduct is abhorrent to an organized judicial system, jeopardizes the public health and the safety of New Jersians, and must not be tolerated," the letter said.

The deputy attorney general pointed out that the $10,000 daily sanction is within the gym's means since it has raised more than $143,000 through GoFundMe for its legal fees, and is appropriate due to the "galling nature" of the owners' behavior.

Also, the state wants to recoup the $4,888 in legal fees it racked up lodging the contempt motion, according to the letter.

The battle began in federal court with Atilis' May lawsuit alleging that Gov. Phil Murphy's March shutdown of nonessential businesses runs afoul of federal civil rights laws as well as the due process and equal protection clauses of the Fifth and 14th amendments to the U.S. Constitution. Owners Ian Smith and Frank Trumbetti criticized the orders in interviews with local and national media outlets.

The arguments moved to state court, where Murphy and health officials already had an action pending over the gym's refusal to close. Meanwhile, the gym began racking up summonses after repeatedly reopening even despite Murphy's mandate and health department order specifically targeted at the gym.

The state moved for sanctions in July when the gym refused to comply with a relaxed order to limit operations to individualized, appointment-based instruction. Judge Lougy initially refused, but switched gears days later after a Camden County surveillance team and state health investigators observed continued defiance.

On July 27, Smith and Trumbetti were **arrested** and released with a disorderly persons summons for one count each of contempt, obstruction and violation of the New Jersey Disaster Control Act. Three days later, Smith publicly announced plans to kick down the barricade on Aug. 1.

Asked for comment, a spokesperson for the New Jersey Attorney General Gurbir S. Grewal referred to the content of the letter.

An attorney for the gym did not immediately respond to a request for comment.

Case 2:20-cv-10812-SDW-LDW   Document 1   Filed 08/19/20   Page 52 of 52 PageID: 52

New Jersey is represented by Stephen Slocum of the attorney general's office.

The gym is represented by Christopher Arzberger of the Russell Friedman Law Group LLP and James G. Mermigis of The Mermigis Law Group PC.

The case is Persichilli v. Atilis Gym of Bellmawr, case number MER-C-48-20, in the Superior Court of New Jersey, Mercer Vicinage Chancery.

--Editing by Abbie Sarfo.

---

All Content © 2003-2020, Portfolio Media, Inc.